**LUMBERMENS MUTUAL CASUALTY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 04–1255C.**

United States Court of Federal Claims.

Nov. 25, 2009.

Mark Gerard Jackson, Ball, Janik, LLP, Seattle, WA, for plaintiff.

Leslie Cayer Ohta, Trial Attorney, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## ORDER AND OPINION

HODGES, Judge.

Plaintiff issued Miller Act performance and payment bonds for a contract between the Navy and Landmark Construction. Landmark defaulted on the contract, having completed only fifteen percent of the work. The Government had paid Landmark forty percent of the progress payments at default because the Navy had not followed contract procedures required by the Federal Acquisition Regulation and its contract with Lumbermens.

Lumbermens paid Landmark's vendors and subcontractors, and hired Atherton Construction to complete Landmark's contract with the Navy. Lumbermens and Atherton signed a takeover agreement with the Navy. The contract included a provision substituting Atherton for Landmark as the contractor. Lumbermens paid over $3 million to complete the contract. It reimbursed Atherton an additional $1 million in liquidated damages assessed by the Government because the contract was seven months past the original completion date. Lumbermens signed the takeover agreement as a surety fulfilling its performance bond obligation, not as a contractor completing a construction project. The Navy did not implement FAR provisions that would have protected the surety, and plaintiff suffered damages as a result. We have jurisdiction to award plaintiff damages for impairment of collateral and to reimburse plaintiff for funds withheld by the Government improperly.

## FACTS

The Navy awarded Landmark Construction Company a $9,878,026 contract to repair and renovate 160 military family housing units in Oak Harbor, Washington, in April 2000. The scheduled completion date was October 23, 2002. Landmark furnished Miller Act performance and payment bonds through Lumbermens Mutual Casualty Company. See 40 U.S.C. § 3131 (2000). Lumbermens issued a payment bond for $2.5 million and a performance bond for the contract price.

The Navy paid over $3.8 million on six invoices submitted by Landmark between July and December 2000, until it began to receive complaints from the contractor's suppliers and subcontractors in January 2001. In response to the complaints, the Navy withheld Landmark's January 2001 progress payment, but resumed payments after Landmark assured the Navy in February that it would pay the suppliers and subcontractors.

Landmark agreed in February 2001 to a contract modification that added twenty-one housing units to the contract. The Navy authorized $1,884,174 for the additional units, for a contract total of $12,158,663 after modifications. The Navy did not extend the completion date. Lumbermens declined to provide bonding for the additional units, which were not begun prior to Landmark's default.

Landmark notified the Navy in late June 2001 that it had furloughed all its worksite employees. The Navy warned against default, then issued a cure notice in mid-July. Landmark abandoned the site soon thereafter. The Navy terminated Landmark's contract for default on August 2, 2001. Landmark had not received a Notice to Proceed for the additional units before the Navy ter-

minated the contract for default. Liquidated damages were seventy-five dollars per day, per unit.

When the Government terminated Landmark for default, approximately $7.3 million remained to be paid on the contract. The Navy had paid Landmark approximately forty percent of the modified contract by then, though Landmark had completed only twenty-two of 181 units. Fifty-six units were in various states of renovation. The Navy did not maintain records of its payments to Landmark, or verify that materials purchased by Landmark were in its possession. The Navy had no information about the materials the Government had paid for and for which title should have passed to the Navy.

Defendant made demand of the surety under the performance bond, and Lumbermens hired Atherton Construction to complete the contract. Atherton agreed to complete the original contract as modified to include twenty-one units that were not a part of the contract that Lumbermens bonded. Atherton contracted with another surety to cover the additional units.

Lumbermens and Atherton signed a separate completion contract. They agreed that Lumbermens would be responsible for liquidated damages assessed by the Government for contract completion between October 23, 2002, and June 22, 2003. Atherton would be liable for assessments after June 22, 2003.

Landmark had been ahead of schedule when it abandoned the job, and it was only two weeks behind schedule when the Navy terminated for default. However, the Government waited five months before signing a new agreement with Lumbermens and Atherton. The Navy believed that Atherton could finish the job on time in October 2002, despite the five-month delay. Atherton began work on November 28, 2002.

In January 2002, Atherton discovered safety code violations in the electrical work completed by Landmark. The faulty wiring created a "life safety issue" that implicated the critical path, according to Atherton. The Navy did not agree that the wiring caused a life safety issue or that it affected the critical path. Nonetheless, the Navy proposed a contract modification to fix the electrical problems when Atherton and Lumbermens sent a letter holding themselves harmless from liability for the electrical systems.

The Navy denied Atherton's requests for extensions because of the electrical problems, though Atherton did not resume work until March 2002. The electrical issue had delayed the project forty-six days. The Navy also denied time extensions for completion of the twenty-one units not contemplated by the original contract. As a result, Atherton worked on the new units and the original units concurrently, instead of completing the base units first as it had planned.

Atherton completed the project on June 6, 2003. This was well after the completion date specified in the original contract and in the takeover agreement, but sixteen days before the date agreed to by Atherton and Lumbermens in their separate completion contract. The Government assessed Atherton liquidated damages of $721,275 for the base units and $304,800 for the additional units.

## DISCUSSION

According to the Government, this court does not have jurisdiction over the takeover agreement because Lumbermens did not submit a claim to the contracting officer. The Contract Disputes Act requires a contractor to submit a claim to the contracting officer before filing suit in this court. 41 U.S.C. § 605 (2000). The CDA applies only to procurement contracts, however, and Lumbermens signed the takeover agreement in its capacity as a surety. *See e.g. Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983) (noting that the CDA applies to "express or implied contracts for the procurement of services and property and for the disposal of personal property."). A takeover agreement is not a contract for the procurement of materials or services, but an agreement by which the surety agrees to fulfill its obligations under a performance bond.

The Navy did not abide by the payment provisions of its bonded contract with Landmark, according to Lumbermens, and thereby increased the surety's risk. The Navy

would not have overpaid Landmark had it complied with the contract's payment provisions, and Lumbermens' collateral would have been available for its use in fulfilling the bond requirements. Lumbermens also argues that the Navy breached the takeover agreement by withholding liquidated damages for Atherton's construction delays and refusing to give Atherton materials paid for by the Navy. The Government contends that Lumbermens failed to exercise care in issuing and administering its payment and performance bonds, and failed to establish as a matter of law that the Navy caused impairment of its collateral.

### Federal Acquisition Regulation

The contract between the Navy and Landmark incorporated various payment provisions required by the Federal Acquisition Regulation. The Navy could issue progress payments so long as Landmark satisfied FAR payment provisions included in the contract. For example, Landmark was required to provide a Schedule of Prices, a Network Analysis Schedule, and certifications of completion.

■ The FAR includes contract provisions designed primarily to protect the Government, but sureties look to the regulations in weighing their risk of issuing bonds. For example, contract payment provisions required by FAR were intended to keep the Navy abreast of Landmark's performance on the job. If the Navy had enforced these requirements, it would have received information from Landmark on the work completed, the payments Landmark made to its subcontractors, and the materials purchased by the prime. The Navy would have understood that Landmark was submitting invoices for materials that it had not supplied and padded invoices for materials that it already had. It would have had records of materials that should have belonged to the Navy and served as collateral for Lumbermens' bonds.

The contract required Landmark to submit a Schedule of Prices. The Schedule of Prices is a detailed itemization of the contract price and an explanation of where and how the money should be spent. It enables a contracting officer to approve or deny progress payments. Landmark was required to submit a Schedule of Prices with its final design; the Government could not issue payments under the contract until the Schedule had been approved by the contracting officer.

The Network Analysis Schedule is a chart that breaks a contractor's work schedule down into a series of tasks and dates to show how they relate to each other and to the job completed. See 48 C.F.R. 52.236–15 (2000). An NAS is required of contractors to show how they expect to complete the job. Landmark submitted its substitute Schedule of Pricing as a part of the Network Analysis Schedule. This Landmark version of a Schedule of Pricing omitted information regarding quantities, unit prices, and extended costs of a task.

The contract required Landmark to submit a certification with each invoice. This document certifies that each invoice submitted by the contractor requests payment only for services within the contract; that previous payments were used to pay subcontractors; and that no funds would be withheld from subcontractors without reason. *Id.* § 52.232–5(c). The Navy began paying Landmark upon receipt of its second invoice despite its not having submitted certifications with the invoices.

This case is similar to *National Surety Corp. v. United States,* 118 F.3d 1542 (Fed. Cir.1997). The Government was required to retain ten percent of each progress payment until a "complete project arrow diagram" had been approved. *Id.* at 1543. The contracting officer had discretion to issue all payments in full once the Government determined that the contractor's progress was satisfactory. If the contractor's work was unsatisfactory, the contracting officer could withhold ten percent of any or all payments.

The Government in *National Surety* did not withhold retainage despite the contractor's failure to provide a required project arrow diagram. *See id.* National Surety sued for the money that should have been retained by the Government until the contractor delivered the contract-required diagram. The Federal Circuit held the Government liable to the surety for the improper release of retainage security. Damages were

to be based on the surety's actual damages attributable to the release of retainage. *See id.* at 1548.

The contracting officer for the Navy in this case had discretion and responsibility similar to that in *National Surety*. Payments were not to be issued until a conforming Schedule of Prices and a Network Analysis Schedule had been presented, and each invoice had to be accompanied by required certifications. Once those requirements were met, however, the contracting officer could pay any amount that accorded with the contractor's progress in his discretion, so long as he had a certified invoice for each payment. The Navy was not required to withhold a certain amount of money, but it was required to refuse payment until specific FAR requirements were fulfilled. The Navy's failure to follow its contractual provisions resulted in prejudice to Lumbermens, just as the Government's failure to withhold ten percent retainage caused injury to National Surety.

### Delays

■ Defendant's assessment for delays related to defective wiring was improper because the Navy was responsible for the condition that led to the delays. However, delays related to the additional units were Atherton's responsibility; defendant had the contract right to withhold liquidated damages for those delays. Perhaps the Government should have given Atherton an extension of time to handle the work required by twenty-one additional units, but it was not required by contract to do so.

Lumbermens did not bond Atherton's work on the additional units, but it reimbursed Atherton for liquidated damages attributable to that work. Atherton could not have asserted a claim against the Navy for those assessments, and Lumbermens cannot assert through subrogation greater rights than would have been available to Atherton. *See United States v. Munsey Trust Co.,* 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947).

### Impairment

■ By ignoring important FAR provisions that related directly to Lumbermens' risk, the Navy materially modified its contract with Landmark without Lumbermens' knowledge or consent. Lumbermens' claim against the Navy arises under the doctrine of discharge, which excuses performance by a surety when the surety's rights under the contract are impaired. *See Fireman's Fund Ins. Co. v. United States,* 909 F.2d 495, 497 (Fed.Cir.1990) (stating that where the Government departs from or alters the terms of its bonded contract, the surety is discharged from its obligations if it can show injury, loss, or prejudice). If a creditor and debtor modify their contract without consent of the guarantor, for example, the guarantor may be discharged in part if the modification increases its risk. *See Nat'l Surety,* 118 F.3d at 1544 (citing Restatement, Security § 128 at 34041 (1941)).

■ Damages for impairment of suretyship are measured "by the injury, loss, or prejudice to the surety due to the government's failure to implement the required retention." *Nat'l Surety,* 118 F.3d at 1545 (discussing the Government's failure to retain progress payments). The Navy was not required to withhold a certain retainage, but to withhold payment pending Landmark's compliance with provisions of FAR. Damages are measured equitably according to the injury that Lumbermens can show resulted from the Navy's actions.

■ Subrogation is a principle of equity whereby "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 137, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Lumbermens stands in the shoes of one entitled to obtain reimbursement from the Navy—in this case, Atherton. However, Lumbermens as surety may acquire by subrogation only rights that would have been available to Atherton. *See Munsey Trust Co.,* 332 U.S. at 242, 67 S.Ct. 1599. Some of the delay was caused by a faulty electrical system wired by the Navy's original contractor. Liquidated damages assessed for Atherton's relatively inefficient concurrent work on the additional units were not improper, however, because the Navy did nothing to interfere with or impede Atherton's work.

The Navy paid Atherton directly and withheld liquidated damages directly from Atherton; it did not assess damages against Lumbermens. Lumbermens had no obligation to reimburse Atherton for the liquidated damages that resulted from contract work that Lumbermens did not bond. Plaintiff's obligation to reimburse such damages arose from the separate completion contract that Lumbermens signed with Atherton voluntarily. The Navy is not responsible for reimbursing plaintiff's obligations incurred pursuant to a separate agreement.

### Schedule of Prices

The Government increased Lumbermens' risk as surety by violating its own FAR requirements that the contractor submit a conforming Schedule of Prices, a proper Network Analysis Schedule, and progress payment certifications as a condition precedent to paying invoices. The contract states:

> The schedule of prices shall be a detailed breakdown of the contract price, giving quantities for each of the various kinds of work, unit prices, and extended prices. Submit the Schedule of Prices to the Government with the Final Design Submittal in accordance with Section III for approval by the Contracting Officer. Payment for construction work will not be made until the Schedule of Prices has been approved by the Contracting Officer.

Pl.'s Ex. 8.

■ Landmark submitted a Schedule of Prices as part of the Network Analysis Schedule. The Schedule did not include costs of construction on a per-unit basis; information concerning costs related only to the overall contract price. The Navy's project engineer testified that he asked Landmark to resubmit a Schedule that distinguished cost of materials from costs of labor. The revised Schedule received from Landmark differentiated between labor and materials, but neglected to include required information concerning quantities and prices.

The contracting officer altered the contract materially by not enforcing the Schedule of Prices provision. He did not review the revised Schedule, but delegated that authority to the project engineer. The project engineer accepted Landmark's figures without

inquiry. He evaluated the revised Schedule by determining on his own what materials were needed for the project and what the total cost should be. He did not consult an independent government estimate of prices for each activity, but relied instead on Landmark's figures. The contracting officer trusted the project engineer to review the Schedule of Prices. The project engineer accepted the values submitted by Landmark with little or no question. Landmark's project manager admitted that he front-loaded the Schedule of Prices by creating excessive values for materials purchased early.

The Navy's omission of required payment procedures rendered it blind to Landmark's scheme for padding invoices and otherwise overcharging the Government for materials and supplies. An appropriate Schedule of Prices against which the Navy could have referenced invoices would have prevented substantial overpayments to Landmark and the resulting compromise of Lumbermens' collateral.

### Network Analysis Schedule

■ The contract between the Navy and Landmark required Landmark to include an updated Network Analysis Schedule with every invoice. Landmark's Network Analysis Schedule should have included each work task, the amount charged, all subcontractors and the value of their work, the amount of the subcontract charged in the invoice being presented, and the amount the contractor had already paid each subcontractor. *See* 48 C.F.R. § 52.232–5.

The contract required that Landmark's Network Analysis Schedule account for at least thirty activities per housing unit with a minimum of one thousand activities for the entire project. The contractor was required to provide for each activity the activity number, description, estimated duration of the activity, the earliest, actual, and latest start and finish dates, total float time available, cost, responsibility code, crew size, percent complete, and the amount earned at the time of the report.

Landmark's Network Analysis Schedule specified thirty activities for each unit, but many activities were listed without costs or

responsibility codes. Other activities were grouped together in a way that prevented the Navy from discerning costs for certain materials.

The contract required the contracting officer to approve all invoices prior to payment. Each invoice was to include an updated Network Analysis Schedule. The contracting officer was responsible for seeing that a Network Analysis Schedule accompanied each invoice, but he did not. He authorized payment without reviewing the NAS or discussing it with the project engineer. The project engineer should have used the Network Analysis Schedule to verify the amount of progress made on the building project. The project engineer did not require Landmark to adhere to the Network Analysis Schedule guidelines provided in the contract, so the chart was less efficient in measuring Landmark's progress.

Landmark used the Percent Complete column in the NAS to display the percentage of the total contract price for which it had billed the Navy. The contracting officer testified that the Navy issued progress payments in response to Landmark's invoices without knowing how much work it had completed. Large discrepancies exist between the amount for which an activity was invoiced and paid and the work that was completed. For example, Landmark had billed the Navy $375,000 for doors and windows by the time it defaulted in August, but had received doors and windows worth only $310,916.

Landmark billed the Navy $140,000 for cabinets that it had paid $10,405 for during the same month. The quality assurance inspector, the project engineer, and the contracting officer each approved that invoice. The contracting officer could not account for the difference of over $129,000 in materials received and amount invoiced. He stated that Landmark was not permitted to bill for cabinets it had not ordered or received, and could not explain why the quality assurance inspector would have authorized such an egregious overpayment.

The contract required that title to all materials purchased for the project pass to the Navy upon payment to Landmark. The Network Analysis Schedule should have provided a record of construction materials owned by the Navy. Had Landmark used the NAS properly, the Navy would have known what materials it owned and could have provided them to Atherton under the takeover agreement. The Navy did not have access to many of the supplies for which it had paid Landmark because it often paid invoices before Landmark had received the materials.

The contracting officer relied on the project engineer to determine whether the Network Analysis Schedule was an accurate representation of the project's progression. The contracting officer assumed the project engineer reviewed the schedules and information he received from the quality assurance inspector. The project engineer assumed the quality assurance inspector verified the information he received from Landmark personnel regarding an accurate percentage of work performed and materials received. However, the Navy's quality assurance inspector made no effort to verify that Landmark's project manager relayed accurate information.

If the Navy had implemented the Network Analysis Schedule correctly it would not have overpaid Landmark and it would have had an accurate record of all purchased materials. Lumbermens was entitled to all materials the Navy recorded as having been purchased and the remaining contract balance, less liquidated damages, after it satisfied its obligations under the performance bond. The Navy's failure to comply with the payment provisions of the contract resulted in additional costs for Lumbermens. Plaintiff is entitled to damages that resulted from the Navy's negligence in administering this contract.

### Payment Specifications

The bonded contract required Landmark to certify that the amounts it requested from the Navy were appropriate under the terms of the contract, that all payments due to subcontractors and suppliers under previous invoices had been made, and that no payment from the currently certified invoice would be withheld from a subcontractor or supplier. 48 C.F.R. § 52.232–5(c). FAR emphasizes that "the Contractor shall furnish [this] certification, or payment shall not be made." *Id.*

This is a mandatory requirement for any contractor operating under a contract with the Government. The contracting officer may not pay the contractor if the certification is not included with the invoice.

The Navy issued payment to Landmark for eleven invoices. Only four of those invoices contained a progress payment certification. Of these four certifications, only three satisfied the language of FAR. The fourth certification stated, "[p]er our agreements with our suppliers and vendors, they are being paid in accordance with their payment schedule." The contracting officer testified that he had the authority to modify or waive the certification requirements.

■ If the Government departs from or alters the terms of its bonded contract, the surety is discharged from its obligations if it can show injury, loss, or prejudice. *Fireman's Fund Ins. Co.*, 909 F.2d at 497. The Federal Circuit noted in *National Surety* that "any change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation." 118 F.3d at 1547.

■ The Government breached the Schedule of Prices provision, the Network Analysis Schedule provision, and the contractor certification requirement of FAR 52.232–5. The Navy overpaid Landmark as a direct result of these infractions, and may have enabled an apparent fraud against the United States.

The surety had to pay for materials that were purchased by Landmark and paid for by the Navy, but not made available to Atherton because the Navy did not obtain title to the goods. A surety must rely on the Government to administer a contract properly because the surety is not a party to the bonded contract. Lumbermens relied on the Navy to adhere to the payment provisions of its contract with Landmark, and Lumbermens is discharged from its obligation as surety to the extent the Navy's noncompliance increased Lumbermens' risk.

## DAMAGES

### Impairment of Collateral

■ The Federal Circuit ruled that the Government owes a surety the duty to "administer the contract … in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." *Nat'l Surety*, 118 F.3d at 1546. Damages for government actions that increase the surety's risk without its consent are measured by the "injury, loss, or prejudice to the surety" due to the Government's failure to administer the contract properly. *Id.* at 1545. *Pro tanto* discharge is one of the means by which a court may mitigate the prejudice to a guarantor or surety. The Federal Circuit has emphasized the equitable nature of suretyship law:

> [The] recovery should not exceed any losses that ensued, directly or indirectly, from the impairment of the security. Thus it is relevant to consider what the contractor did with the released funds. If the unauthorized payments were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby, any injury to the surety would to that extent be mitigated. Account should also be taken of opposite effects, such as whether the unauthorized release reduced the contractor's incentive to complete the contract, thereby increasing risk to the surety.

*Id.* at 1548. Landmark did not use the released funds to pay subcontractors or suppliers, or to reduce Lumbermens' injury, loss, or prejudice. The record of trial suggests that Landmark's management converted the funds to their own use. Lumbermens is entitled to damages measured by the Navy's impairment of its collateral.

The parties' experts determined the Navy's overpayment to Landmark by considering the percentage of the project Landmark had completed when the contractor defaulted. Plaintiff's expert used an Earned Value method to make this determination, while the Government expert used the Cost–to–Cost method. The earned value method measures project performance by analyzing the value of a project as completed. The cost-to-cost method calculates the completion percentage by comparing the costs incurred by the parties—in this case, Landmark's costs compared to Atherton's.

The cost-to-cost method is used primarily to determine costs and revenue for a single contractor completing a single contract. Defendant's expert was not "aware of any article or peer reviewed paper in which [the cost-to-cost method had] been applied" in this fact situation; i.e., where two contractors completed a single contract. Defendant's method did not take into consideration the fact that Landmark billed the Government for materials that it did not order. The cost-to-cost method cannot be used where a project is tainted by fraud.

Landmark contracted with the Navy to renovate 160 housing units. Landmark completed only twenty-two units. Atherton completed eighty-two units, finished the work on fifty-six partially-completed units, and constructed twenty-one additional units required by the contract modification. Landmark completed eighteen percent of the original 160 units for approximately forty percent of the contract price. Applying a unit value of $27,072.10, defendant is responsible for overpayments of $1,375,420.11, according to the earned value method described above.

Landmark's budget for doors and windows was $500,000, or $3,125 per unit. The Navy paid Landmark $375,000 for completing twenty-eight units. The reasonable value of the job as a percentage of the total budget was $87,500, the amount the Navy should have paid Landmark for doors and windows. The Navy overpaid Landmark by $287,500.

Landmark's budget for cabinets was $500,000, or $3,125 per unit. The Navy paid Landmark $260,000 for twenty-five units. Landmark submitted purchase orders totaling $453,053.73 for the cabinets. The percentage completed multiplied by the reasonable value of the cabinets is $70,789.65—the amount defendant should have paid Landmark. The Navy overpaid Landmark $189,210.35 for the cabinets.

Landmark's budget for paint was $300,000, or $1,875 per unit. The Navy paid Landmark $156,000 for twenty-two units. The reasonable value of the paint is $22,843.74—the total of purchase orders that Landmark submitted to the paint supplier. The Navy overpaid Landmark by $133,156.26 for the paint.

Landmark's budget for flooring was $485,940, or $3,037 per unit. Defendant paid Landmark $485,940 for fifty units completed. Landmark purchased the full amount of flooring needed for the project and was paid in full, but Atherton purchased additional flooring for $120,000 to complete the job. The reasonable value of flooring was $350,836.43, based on the total amount paid to the flooring subcontractor, or $2,193 per unit. The percentage completed multiplied by the reasonable value of flooring that Landmark delivered to the Navy shows that the Navy should have paid Landmark $108,879.01 for the flooring. The Navy overpaid Landmark by $377,060.99.

Landmark's budget for siding was $287,040, or $1,794 per unit. Landmark completed fifty-four units for which the Navy paid Landmark $287,040. The reasonable value of the siding is the amount Landmark listed on the bid it submitted to the Navy—$160,000. The percentage completed multiplied by the reasonable value of siding that Landmark delivered to the Navy shows that defendant should have paid Landmark $54,000 for the siding. The Navy overpaid Landmark by $233,040.

Landmark's budget for abatement, using the method of calculation described above, was $882,000, or $5,513 per unit. Defendant paid Landmark $458,640 for fifty-five units. Accepting the total budget as the reasonable value for the job, the Navy overpaid Landmark by $155,452.50 for abatement.

The Navy did not overpay Landmark for personnel costs, which are considered fixed overhead. Fixed costs are allocated across the length of a contract. The Navy gave Landmark slightly over thirty months to complete the entire project. Landmark divided the fixed costs of personnel and overhead into twenty-five periods in anticipation of completing the job five months early. Landmark's budget for personnel was $728,834. The Navy paid Landmark $378,994 for thirteen months of personnel work.

The Navy paid Landmark $590,000 for sitework, which included demolition, paving, earthwork, grading and drainage, installing

sewer systems, irrigation, landscaping, rockeries and pipe tube railing, and play areas and amenities. Landmark completed 100% of the sitework on the project, and paid that subcontractor in full. The contracting officer should have questioned some of the purchases made and invoiced by Landmark, but all materials for which Landmark billed survived and were accepted by the Navy. We cannot say that defendant overpaid Landmark for sitework, given the scope and purpose of this Opinion.

The following chart shows the calculations described above, in summary form:

| Total damages | Reasonable value of materials | Total Paid to Landmark | Overpayment |
|---|---|---|---|
| Doors & Windows | $87,500.00 | $375,000 | $287,500.00 |
| Cabinets | $70,789.65 | $260,000 | $189,210.35 |
| Paint | $22,843.74 | $156,000.00 | $133,156.26 |
| Flooring | $108,879.01 | $485,940.00 | $377,060.99 |
| Siding | $54,000.00 | $287,040.00 | $233,040.00 |
| Abatement | $303,187.50 | $458,640.00 | $155,452.50 |
| Personnel | $378,994 | $378,994 | $0.00 |
| Sitework | $590,000.00 | $590,000.00 | $0.00 |
| **Totals** | **$1,616,193.57** | **$2,991,613.68** | **$1,375,420.11** |

## CONCLUSION

Plaintiff reserved all rights that it established under the original bonded contract. It has acted solely as surety throughout these proceedings. This court has jurisdiction over the takeover agreement pursuant to the Tucker Act. See 28 U.S.C. § 1491.

Lumbermens reimbursed Atherton for liquidated damages assessed by the Government for Atherton's failure to complete twenty-one units on time. These were units added by modification to the contract between Landmark and the Navy. Lumbermens' agreement to compensate Atherton if the Navy assessed liquidated damages was independent of its contract with the Navy. Atherton alone was at fault for missing the deadline, and it could not have made a claim against the Navy for reimbursement. Plaintiff therefore cannot collect reimbursement for the liquidated damages that it paid Atherton voluntarily or by separate contract.

The Navy was responsible for the faulty electrical wiring that delayed Atherton in completing the project. It was aware of the faulty electrical wiring as early as August 2000, when Landmark first raised the issue of electrical wiring problems during a design review meeting on August 24. The Navy refused to address the faulty wiring while Landmark was on the project, and did not acknowledge the problem when Atherton took over construction in January 2002.

Defendant ultimately conceded that the wiring posed a safety hazard and issued a modification order. However, it penalized Atherton by not considering the resulting forty-six day delay when it withheld liquidated damages. Thus, the Navy ignored a potentially dangerous defect, refused to acknowledge its seriousness, and caused a delay in completion of the project as a result. It compounded the problem by assessing damages when Atherton was unable to finish on time.

Plaintiff established government delay, the extent of the delay, and the fault of the delay. See, e.g., Wilner v. United States, 24 F.3d 1397, 1401 (Fed.Cir.1994) (stating, "when the claim being asserted . . . is based upon alleged government-caused delay, [plaintiff] has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor."). Defendant assessed a total of $1,015,125 for delays, including $713,475 for Atherton's delay in finishing the base units and $301,650 for its delay in finishing the additional units. It should have assessed $457,650 for the base units and $230,775 for the additional units, for a total of $688,425. The difference between what the Navy assessed Atherton and what it should have assessed is $326,700.

Lumbermens obligated itself to Atherton to compensate the contractor for any money withheld by the Navy in cases where Atherton was not at fault. The principles of equitable subrogation provide that Lumbermens can exercise any claim Atherton has against the Navy. The Navy improperly assessed damages against Atherton for a forty-six day delay in completing the base and additional units. Plaintiff may step into Atherton's shoes to collect reimbursement of $326,700 from the Government for liquidated damages.

The Navy violated the terms of its contracts with Landmark, Atherton, and Lumbermens, and it ignored the contract requirements of its own regulations. As a direct result of its disregard of key FAR provisions and contractual obligations, the Navy impaired collateral that Lumbermens relied on to support its bond. The record of trial establishes damages for impairment of suretyship in the amount of $1,375,420.11.

The judgment consists of $1,375,420.11 for impairment and reimbursement of $326,700 for liquidated damages assessed improperly against Atherton. The Clerk of Court will enter judgment for plaintiff in the amount of $1,702,120.11. No costs.