# United States Court of Appeals for the Federal Circuit

_____

**LUMBERMENS MUTUAL CASUALTY COMPANY,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

_____

2010-5086, -5087

_____

Appeal from the United States Court of Federal Claims in case no. 04-CV-1255, Senior Judge Robert H. Hodges, Jr.

_____

Decided: August 3, 2011

_____

MARK G. JACKSON, Ball Janik, LLP, of Seattle, Washington, argued for plaintiff-cross appellant. With him on the brief was MATTHEW C. HOYER, of Washington, DC.

DONALD E. KINNER, Assistant Director, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director and CHRISTOPHER L. KRAFCHEK, Trial Attorney. Of counsel was LESLIE CAYER OHTA.

EDWARD G. GALLAGHER, The Surety & Fidelity Association of America, of Washington, DC, for amicus curiae The Surety & Fidelity Association of America.

————————————

Before BRYSON, MAYER and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

This case requires us to decide three issues concerning the jurisdiction of the United States Court of Federal Claims ("Claims Court") in actions brought by Miller Act sureties against the United States. *See* 40 U.S.C. § 3131(b) (2006) (formerly 40 U.S.C. § 270a).

In *Insurance Company of the West v. United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001) [hereinafter *ICW*], we held that the Claims Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, over sureties' claims against the government that are based upon the theory of equitable subrogation. The first issue presented in this appeal is whether the surety's claim against the United States seeking to recover allegedly improper progress payments made to the contractor is an equitable subrogation claim and is therefore within Tucker Act jurisdiction under *ICW*. We conclude that the surety's claim is not an equitable subrogation claim because the United States made the payments in question before it received notice of the contractor's default.

The second issue is whether the Claims Court has Tucker Act jurisdiction over impairment of suretyship claims against the government apart from the theory of equitable subrogation. We hold that the United States' waiver of sovereign immunity under the Tucker Act does not extend to such claims.

The final question is whether the administrative requirements of the Contract Disputes Act ("CDA"), 41 U.S.C. § 601 *et seq.*, apply to a surety's claim against the United States arising from a takeover agreement which the government and surety have entered into for the completion of a bonded contract following the principal obligor's default. We hold that such claims fall within the scope of the CDA and that, as such, the Claims Court lacks jurisdiction over a surety's takeover agreement claim where the surety has failed to satisfy the CDA's jurisdictional prerequisites.

BACKGROUND

I

On April 11, 2000, Landmark Construction Company ("Landmark") and the United States Navy ("Navy") entered into a contract under which Landmark agreed to repair and renovate 160 military family housing units for the price of $9,878,026. The contract required construction to be completed by October 23, 2002, and it provided for liquidated damages of $75 per unit, per day past that date. In accordance with the Miller Act, 40 U.S.C. § 3131(b) (2006) (formerly 40 U.S.C. § 270a), the contract required Landmark to furnish performance and payment bonds.

To fulfill the construction contract's bond requirement, Landmark entered into two suretyship agreements with Lumbermens Mutual Casualty Company ("Lumbermens") on April 20, 2000, under which Lumbermens issued a payment bond (for $2.5 million) and a performance bond (for the $9,878,026 contract price). The United States was not a party to either suretyship agreement, but both contracts expressly identified the United States as the intended third-party beneficiary of the bond in the event Landmark breached its obligations.

On February 27, 2001, Landmark and the Navy agreed to add 21 housing units to the construction contract (for a total of 181 units) in exchange for increasing the contract price by $1,884,174. The modification did not extend the contract's completion date, which remained October 23, 2002. Lumbermens did not provide payment or performance bonds for the additional units.

On July 20, 2001, Landmark informed the Navy that it was unable to complete the construction contract due to financial problems, and it abandoned the construction site soon thereafter. The Navy terminated Landmark for default on August 2, 2001. At that time, Landmark had completed only 22 (about 12%) of the 181 housing units, but the Navy had already given Landmark payments equal to $4,793,633—approximately 40% of the modified contract price. In making these payments, the government allegedly ignored multiple Federal Acquisition Regulation ("FAR") provisions incorporated into the contract that were purportedly aimed at ensuring progress payments would correspond to the amount of work actually completed. For example, under the FAR payment provisions, progress payments were not to be issued until Landmark provided a Schedule of Prices (an itemization of the contract price detailing how all funds would be spent), a Network Analysis Schedule (a chart breaking down the contractor's work schedule into a series of tasks and dates), and, for each invoice, a Certification of Completion (a document certifying that the invoice submitted by the contractor only requests payment for services within the contract). Lumbermens contends that the government did not enforce these FAR provisions; that the provisions were intended to benefit the surety as well as the government; and that Lumbermens was injured as a result of the government's lax enforcement.

Following Landmark's default, the United States exercised its rights as an intended third-party beneficiary of the performance bond and demanded that Lumbermens complete the construction contract. Lumbermens accepted its obligation and hired Atherton Construction ("Atherton") to complete the job. The three parties—Lumbermens, Atherton, and the United States—entered into a "takeover agreement" on November 20, 2001, under which Lumbermens agreed that, "in accordance with [its] obligations under [the] Performance Bond," "it [would] undertake the completion of the work and [would] contract with [Atherton] for completing the work remaining under the contract." J.A. 314. Atherton agreed to complete the entire modified contract, including the 21 additional units that were not part of the original contract bonded by Lumbermens, and it contracted with another surety to bond the additional units. Lumbermens and Atherton also entered into a separate "completion" contract under which they agreed that Lumbermens would be responsible for all liquidated damages assessed by the government between October 23, 2002, and June 22, 2003, and Atherton would be liable for assessments thereafter.

In January 2002, after beginning construction, Atherton discovered safety code violations in the electrical work completed by Landmark. The Navy had previously been notified of the faulty wiring issue by Landmark during a design review meeting on August 24, 2000. Though the electrical issue delayed Atherton's work by 46 days, the Navy denied Atherton's requests for an extension.

Atherton completed the construction project on June 6, 2003. Because this was after the contract's October 23, 2002, completion date, the Navy assessed Atherton liquidated damages of $1,015,125—including $713,475 for its delay in finishing the base units from the original construction contract and $301,650 for its delay in complet-

ing additional units under the modified contract.  Because these liquidated damages were all assessed for the period between October 23, 2002, and June 22, 2003, Lumbermens was required to reimburse Atherton pursuant to the parties' completion contract.

## II

Following completion of the construction project, Lumbermens brought suit against the government in the Claims Court under the Tucker Act, 28 U.S.C. § 1491, seeking to recover damages under three theories, which we now discuss.

### A.  Equitable Subrogation

Lumbermens' first claim sought to recover damages under the theory of "equitable subrogation."  J.A. 43. Lumbermens contended the government improperly increased Lumbermens' suretyship costs by making overpayments to Landmark in violation of FAR payment provisions in the bonded contract that were aimed at ensuring progress payments corresponded to work actually completed.  Lumbermens argued that these provisions were included in the construction contract in part for Lumbermens' protection as a surety.  As such, Lumbermens argued, the government owed it a duty to administer the contract according to these provisions so that it did not materially increase Lumbermens' risk under its bond obligations.  By making payments to Landmark before the corresponding work was completed, Lumbermens argued, the government prematurely depleted the contract fund that Lumbermens relied on to support its bond, thereby increasing the amount Lumbermens ultimately was required to pay out to complete the contract following Landmark's default.

The government moved to dismiss Lumbermens' equitable subrogation claim for lack of jurisdiction, contending that the United States has not waived sovereign immunity for claims by a surety based on alleged overpayments on a bonded contract made prior to receiving notice from the surety of the contractor's default. In considering the government's motion to dismiss, the court noted that we recognized in *ICW* that the Claims Court has Tucker Act jurisdiction over sureties' equitable subrogation claims against the government. *See Lumbermens Mut. Cas. Co. v. United States*, 67 Fed. Cl. 253, 255 (2005) (citing *ICW*, 243 F.3d at 1375) [hereinafter *Lumbermens I*]. The court described "[t]he doctrine of equitable subrogation [as] entitl[ing] a surety taking over [a] contract['s] performance . . . to rights that the defaulting contractor would have had against the government." *Id.* at 255. However, the court further noted that "[t]he Government's equitable duty to retain contract funds for the surety is triggered upon notice from the surety that the contractor is in default or that payment should be made to the surety." *Id.* Thus, the court dismissed Lumbermens' "equitable subrogation" claim because it "did not notify the Government that Landmark was approaching default or that the Navy should withhold or divert progress payments" before the payments were made. *Id.*

B. Impairment of Suretyship / *Pro Tanto* Discharge

For its second claim, Lumbermens asserted identical counts to that of its "equitable subrogation" claim on an alternative theory of impairment of suretyship (a.k.a. *pro tanto* discharge), J.A. 31, pointing out that state contract law recognizes such claims. The government moved to dismiss Lumbermens' impairment of suretyship / *pro tanto* discharge claim for lack of jurisdiction, contending that the United States has not waived sovereign immunity for such claims. After a trial, the Claims Court

determined it had jurisdiction over Lumbermens' impairment of suretyship claim without addressing the sovereign immunity issue. *See Lumbermens Mut. Cas. Co. v. United States*, 90 Fed. Cl. 558, 560 (2009) [hereinafter *Lumbermens II*].

The court found that the FAR provisions were included for the benefit of the surety as well as the government. *Id.* at 562. The court concluded that, by making overpayments to Landmark, the government had improperly "impaired collateral that Lumbermens relied on to support its bond." *Id.* at 569. The court accordingly awarded Lumbermens $1,375,420.11 in damages. *Id.* The court rejected Lumbermens request for additional damages based on the government's alleged overpayment of Landmark's personnel costs, finding that these costs were properly paid as "fixed overhead" costs that were "allocated across the length of [the] contract." *Id.* at 567.

## C. Takeover Agreement

Lumbermens' final claim alleged that the United States breached the parties' takeover agreement by withholding an improper amount of Atherton's contract payments as liquidated damages for the contract's late completion. Lumbermens contended the government's liquidated damages assessment against Atherton (ultimately paid by Lumbermens)[1] was excessive because (1) the government was at fault for the 46 day delay caused by its faulty electrical wiring, and (2) the government had no right to assess liquidated damages against Lumber-

---

[1] The parties agree that, by obligating itself under the completion contract to reimburse Atherton for the liquidated damages, Lumbermens was equitably subrogated to Atherton's rights and could assert any claim Atherton had against the government, including Atherton's claim for remission of improperly assessed liquidated damages.

mens based on the late completion of the 21 housing units added to the contract which Lumbermens did not bond. The government moved to dismiss Lumbermens' takeover agreement claim on the grounds that Lumbermens failed to satisfy the jurisdictional prerequisites of the CDA, such as the requirement under 41 U.S.C. § 605(a) and (c)(1) that it first submit a certified claim to the contracting officer.

The court found that the CDA's jurisdictional requirements were inapplicable to Lumbermens' claim because the CDA applies to "contractor[s]" that enter "contract[s] for the procurement of materials or services," whereas Lumbermens signed the takeover agreement "in its capacity as a surety." *Lumbermens II*, 90 Fed. Cl. at 561. With respect to the merits, the court accepted Lumbermens' first argument, rejected its second argument, and awarded Lumbermens $326,700 in remitted liquidated damages. *Id.* at 568–69.

The United States appealed the Claims Court's judgment in favor of Lumbermens to this Court. Lumbermens cross-appealed seeking additional damages with respect to both its impairment of suretyship and takeover agreement claims. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

We first consider the government's contention that the United States has not waived its sovereign immunity with respect to Lumbermens' claims for damages based on the allegedly premature progress payments made by the government to Landmark.

The United States is immune from suit absent "a clear statement . . . waiving sovereign immunity . . .

together with a claim falling within the terms of the waiver." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 498 (2006) (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)). The government's waiver of sovereign immunity "'must be unequivocally expressed in statutory text' and 'will be strictly construed, in terms of its scope, in favor of the sovereign.'" *Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008) (quoting *Lane v. Peña*, 518 U.S. 187, 192 (1996)). Whether the United States has waived sovereign immunity with respect to a particular claim is a question of law, which we review de novo. *ICW*, 243 F.3d at 1370.

The sole basis alleged for the Claims Court's jurisdiction over Lumbermens' claim is the Tucker Act, 28 U.S.C. § 1491(a)(1), which provides in relevant part:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . .

It is clear that Lumbermens was not in privity of contract with the United States prior to executing the takeover agreement. The United States was not a party to either suretyship agreement, although the government was named as the intended third-party beneficiary in both. *See* J.A. 327, 329.[2]  Lumbermens nevertheless

---

[2]   It is well settled that, in this type of suretyship arrangement, the obligee and the surety are not in privity of contract. *See ICW*, 243 F.3d at 1370 (noting that we have "held that there is no [privity of contract]" between the surety and obligee in such cases); *Admiralty Constr., Inc. v. Dalton*, 156 F.3d 1217, 1220–21 (Fed. Cir. 1998) (finding that "the Navy was not a party to the surety agreement," so the surety could not file a Contract Disputes Act claim with the contracting officer); *Fireman's*

contends that "express or implied contracts" jurisdiction exists under the Tucker Act.

## A.  Equitable Subrogation

Lumbermens first contends that it can recover damages based on the government's alleged overpayments to Landmark under an "equitable subrogation" theory, J.A. 43, relying on our decision in *ICW*, 243 F.3d at 1374–75.

In *ICW*, a surety provided performance and payment bonds for a government contract, and the United States was not a party to the suretyship agreements. *Id.* at 1369–70.  Upon incurring financial difficulties, the contractor notified the United States that it would be unable to continue performing, and the surety notified the government that it was to receive all further payments on the contract. *Id.* at 1369.  Nonetheless, the government thereafter continued making payments to the contractor. *Id.*  The surety brought suit against the United States seeking to recover the wrongfully disbursed funds under the theory of equitable subrogation. *Id.*  We held that the Claims Court had jurisdiction because, under the doctrine of equitable subrogation, the surety "step[s] into the shoes of [the] government contractor" and may bring suit under the Tucker Act based on the contractor's privity with the United States under the construction contract. *Id.* at 1369, 1374–75; *see also Nat'l Am. Ins. Co. v. United States*, 498 F.3d 1301, 1304 (Fed. Cir. 2007) (reaffirming that a surety may "invoke the doctrine of equitable subrogation to step into the shoes of the contractor for the

*Fund Ins. v. United States*, 909 F.2d 495, 499 (Fed. Cir. 1990) (finding no privity between the surety and the obligee because, "while the [obligee was] identified as the intended third-party beneficiary of the performance bond, it did not sign the bond or undertake any obligation to Fireman's Fund in it"); *Ransom v. United States*, 900 F.2d 242, 244–45 (Fed. Cir. 1990) (same).

purpose of satisfying the jurisdictional requirements of the Tucker Act").

The Claims Court dismissed Lumbermens' "equitable subrogation" claim here because, before the payments were made, Lumbermens "did not notify the Government that Landmark was approaching default or that the Navy should withhold or divert progress payments." *Lumbermens I*, 67 Fed. Cl. at 255. We agree. The theory of equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety "is subrogated to the [principal obligor's] property rights in the contract balance." *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed. Cir. 1985) (emphasis omitted). That is, the surety "step[s] into the shoes" of the principal obligor and is entitled to all of its rights relating to the construction contract. *ICW*, 243 F.3d at 1374; *see also Nat'l Am. Ins. Co.*, 498 F.3d at 1304, 1307. Here, equitable subrogation is not implicated. Equitable subrogation can be used to recover improper payments to a principal obligor only if made after the obligee received notice of the principal obligor's default (i.e., notice that the bond obligation has been triggered and an implied assignment of the contract rights to the surety has occurred).[3] The alleged overpayments in this

---

[3] *See ICW*, 243 F.3d at 1371 (explaining that "[n]otice from the surety to the [obligee is] essential" for a surety to recover under the theory of equitable subrogation); *Fireman's Fund*, 909 F.2d at 498 (same); *Balboa*, 775 F.2d at 1162–64 (same); *U.S. Fid. & Guar. Co. v. United States*, 475 F.2d 1377, 1384 (Ct. Cl. 1973) (same); *see also* Restatement (Second) of Contracts § 338(1) ("[N]otwithstanding an assignment, the assignor retains his power to discharge or modify the duty of the obligor to the extent that the obligor performs or otherwise gives value *until but not after* the obligor receives notification

case were all made *before* the obligee received notice of Landmark's default. Thus, stepping into the shoes of Landmark at the time of the default notice would not enable Lumbermens to assert a claim for damages based on the government's alleged overpayments to Landmark. This is so because Landmark itself would have no claim against the government for funds the government had already paid it under the contract (as opposed to a right to recover future payments). As we stated in *Fireman's Fund*, "[o]nly when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty." 909 F.2d at 499.

Contrary to Lumbermens' assertions, this court did not hold to the contrary in *National Surety Corp. v. United States*, 118 F.3d 1542 (Fed. Cir. 1997). The court in *National Surety* merely found that the notice requirement for an equitable subrogation claim was satisfied where "the government had knowledge of the default . . . and so informed the surety." *Id.* at 1547. While the *National Surety* court may have arguably misapprehended the particular facts of that case when applying the prevailing rule, the court did not purport to eliminate the longstanding rule that equitable subrogation permits a surety to recover improper payments only if made after the obligee was on notice of the principal obligor's default. Indeed, a panel of this court would lack the authority to eliminate this rule in view of our prior precedents explicitly holding that equitable subrogation only applies to

---

that the right has been assigned and that the performance is to be rendered to the assignee." (emphasis added)); *id.* cmt. e, illus. 4; *id.* § 336(2) ("The right of an assignee is subject to any defense or claim of the obligor which accrues before the obligor receives notification of the assignment . . . .").

payments made after the obligee receives notice of the default.  *See Fireman's Fund*, 909 F.2d at 498; *Balboa*, 775 F.2d at 1162–64; *U.S. Fid. & Guar.*, 475 F.2d at 1384.[4]

Here, Lumbermens does not allege that any improper payments were made to Landmark after July 2001, when Landmark first informed the government of its default. *Lumbermens I*, 67 Fed. Cl. at 254.  Because the government did not make progress payments to Landmark after notice of its default, the Claims Court correctly held that Lumbermens cannot recover the alleged overpayments under the theory of equitable subrogation.

B.  Impairment of Suretyship / *Pro Tanto* Discharge

Alternatively, Lumbermens asserts it was entitled to bring its claim based on the theory of impairment of suretyship / *pro tanto* discharge.  We find that the United States has not waived sovereign immunity as to such claims.

Essential to an understanding of this issue is a discussion regarding the origins of, and theoretical basis for, an impairment of suretyship / *pro tanto* discharge claim. The theory of discharge began as a state law *defense* that a surety could assert to avoid enforcement of its bond obligation on the grounds that the obligee (the beneficiary of the bond) had taken improper actions which prejudiced the surety by increasing its financial risk.  For example, one ground for discharge is when material modifications that increase the surety's risk are made to the bonded

---

[4]     This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling authority such as intervening statutory change or Supreme Court decision." *Tex. Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc).

contract without the surety's consent. *See* Restatement (First) of Security § 128 (1941); *see also* Restatement (Third) of Suretyship and Guaranty §§ 37(2), 41. If such a modification substantially increases the surety's risk by a factor "which cannot fairly be measured," then "the surety is discharged [of its bond obligations] entirely"; otherwise, the surety's bond obligation "is discharged only to the extent of [its] loss"—i.e., a *pro tanto* discharge. Restatement (First) of Security § 128, cmt. (f); *see also Reliance Ins. Co. v. Colbert*, 365 F.2d 530, 535 (D.C. Cir. 1966).

Another ground for *pro tanto* discharge—which corresponds to Lumbermens theory in this case—is that the obligee has prejudiced the surety by improperly making early contract payments or overpayments to the principal obligor in a manner inconsistent with specific payment schedules, conditions, or retainage provisions in the bonded contract. Early payments or overpayments to the principal obligor prematurely deplete the bonded contract fund to which the surety expects a right of equitable subrogation in the event that the principal defaults and the surety is required to perform. *See* Restatement (Third) of Suretyship and Guaranty §§ 37(3)(f), 44 (discussing impairment of right of subrogation); *see also id.* §§ 37(3)(d), 42 (discussing impairment of collateral—i.e., the contract balance). That is, by wasting the contract funds in contravention of the contract's terms, the obligee may impair the surety's future right of equitable subrogation and increase its risk of loss, thereby discharging it from its bond obligation *pro tanto*.[5]

---

[5]    *See, e.g., United States v. Cont'l Cas. Co.*, 512 F.2d 475, 478 (5th Cir. 1975) ("[A] surety is entitled to be subrogated to the benefit of all securities and means of payment under the [obligee's] control, and any act by the [obligee] depriving the surety of this right discharges it pro tanto . . . . [The obligee] . . . must act in good faith

While *pro tanto* discharge, as the government admits, may be asserted as a defense to a government claim asserted under a bond, the problem here is that Lumbermens is asserting the theory of impairment of suretyship not as a defense, but as an affirmative cause of action. Lumbermens correctly points out that, over time, the state law theory of impairment of suretyship / *pro tanto* discharge evolved to encompass not only a defense, but also an affirmative cause of action that allows a surety to seek damages from an obligee after fully performing its bond obligation despite having an impairment of suretyship defense. *See* Restatement (Third) of Suretyship and Guaranty § 37(4) ("If the obligee impairs the [surety's] suretyship status . . . the [surety] has a claim against the obligee with respect to such performance to the extent that such impairment would have discharged the [surety] with respect to that performance."); *id.* cmt. a (noting that "this section and §§ 39–44 provide rules discharging the [surety] from liability . . . and providing for recovery from the obligee if the loss has already occurred because the [bond] obligation has been performed"). When a surety fully performs even though it would have had a right to withhold some amount of performance had it asserted a *pro tanto* discharge defense, the surety has effectively overpaid on its bond obligation. In such cases, "the [surety] is harmed and, but for [a cause of action to recover the excess amount paid], the obligee would receive a

---

and not unreasonably prejudice the surety's right to subrogation."); *Fort Worth Indep. Sch. Dist. v. Aetna Cas. & Sur. Co.*, 48 F.2d 1, 4 (5th Cir. 1931) ("It is well settled that a stipulation in a building contract that a percentage of the price shall be retained until the final completion and acceptance of the work, is as much for the benefit of the surety as for the protection of the [obligee], and a failure to comply therewith releases the former in so far as the rights of the latter are concerned.").

windfall." *Id.* at § 37(4) cmt. d. Thus, the surety's affirmative cause of action for impairment of suretyship stems not from an equitable assignment of rights (like equitable subrogation), but rather is based on an implied-in-law contract theory—i.e., a recovery in the nature of quantum meruit or quantum valebant.

Here, Lumbermens alleged it was prejudiced by the government's overpayments to Landmark that were inconsistent with progress payment provisions in the construction contract and that it was discharged of its bond obligation to the extent of the allegedly improper payments.[6] Lumbermens therefore sought reimbursement from the government under the theory that, by fully performing its bond obligation, Lumbermens conferred more benefit on the government than was legally required and the government was unjustly enriched. While this may be a sound legal theory for recovery against an obligee as a matter of state law, we conclude that the United States has not waived sovereign immunity as to such claims.

In *Department of the Army v. Blue Fox*, 525 U.S. 255 (1999), the Supreme Court directly addressed the issue of sovereign immunity with respect to non-contractual rights created by state law. In *Blue Fox*, an insolvent prime contractor working on a government contract failed to pay a subcontractor for its work. *Id.* at 256. The subcontractor sued the government in federal district court under § 10(a) of the Administrative Procedure Act ("APA") seeking to enforce an equitable lien on any contract funds

---

[6] The government disputes whether the FAR payment provisions at issue were included in the contract for Lumbermens' benefit and, if they were, whether those provisions were violated. We need not reach this question because we find that the Claims Court lacked jurisdiction over Lumbermens' claim.

remaining in the government's possession. *Id.* at 256–57, 260. Section 10(a) of the APA waives sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. The Supreme Court noted that "a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign." *Blue Fox*, 525 U.S. at 261. The Court concluded that the plaintiff's claim for an equitable lien was a claim for money damages and thus outside the APA's waiver of sovereign immunity. *Id.* at 262–63.

But the Court also made clear that state law equitable theories could not be asserted as monetary claims against the government by subcontractors and suppliers. The Court noted that "sovereign immunity left subcontractors and suppliers without a remedy against the Government when the general contractor became insolvent," and that the Miller Act bond requirement was designed to cure that problem. *Id.* at 264.[7] "But the Miller Act by its terms only gives subcontractors the right to sue on the surety bond posted by the prime contractor, not the right to recover their losses directly from the Government." *Id.* The Court explicitly rejected the theory "that subcontractors and suppliers can seek compensation directly against the Government." *Id.* The Court also expressly rejected the plaintiff's contention that its claim was supported by the Court's prior opinions in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132 (1962), *Henningsen v. United States Fidelity & Guaranty Co.*, 208 U.S. 404 (1908), and *Prairie State Bank v. United States*, 164 U.S. 227 (1896)—three Supreme Court cases involving the rights of sureties who stepped into the shoes of the defaulting contractor. *Blue Fox*, 525 U.S. at 264. The Court stated:

---

[7]  In *Blue Fox*, no bond had been provided. *Id.* at 257–58.

> *None of the cases relied upon by [Blue Fox] in-*
> *volved a question of sovereign immunity*, and, in
> fact, none involved a subcontractor directly assert-
> ing a claim against the government. Instead,
> these cases dealt with disputes between private
> parties over priority to funds which had been
> transferred out of the Treasury and as to which
> the Government had disclaimed any ownership.
> *They do not in any way disturb the established*
> *rule that, unless waived by Congress, sovereign*
> *immunity bars subcontractors and other creditors*
> *from enforcing liens on Government property or*
> *funds to recoup their losses.*

*Id.* at 265 (emphases added). Like the claim seeking to
enforce a lien in *Blue Fox*, Lumbermens' impairment of
suretyship / *pro tanto* discharge claim is a non-contractual
cause of action based on state law. As in *Blue Fox*, we see
no waiver of sovereign immunity that unambiguously
consents for the government to be sued based on non-
contractual rights arising under state equitable princi-
ples.

At most, Lumbermens' impairment of suretyship / *pro
tanto* discharge claim can be viewed as being based on an
implied-in-law contract theory (i.e., a quasi-contract or
unjust enrichment theory). While the Tucker Act does
cover "implied contract[s]," the Supreme Court has long
held that the scope of the Tucker Act's waiver of sovereign
immunity "extends only to contracts either express or
implied in fact, and not to claims on contracts implied in
law." *Hercules Inc. v. United States*, 516 U.S. 417, 423
(1996).[8]   Generally speaking, implied-in-law contracts

---

[8]   *See also United States v. Mitchell*, 463 U.S. 206,
218 (1983); *Army & Air Force Exch. Serv. v. Sheehan*, 456
U.S. 728, 738 n.10 (1982); *Hatzlachh Supply Co. v. United*

"impose duties that are deemed to arise by operation of law" in order to prevent an injustice, whereas implied-in-fact contracts are "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (quoting *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597 (1923)).

Lumbermens' theory of recovery is based on the view that it has paid more than it owed and the government was unjustly enriched. Such a claim which "relies on equitable principles" is "presumably based on an implied-in-law contract theory." *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1062 (2001); *see also Royal Indem. Co. v. United States*, 313 U.S. 289, 296 (1941) (stating that equitable principles relate to "recovery on quasi contractual obligations arising from payment of money by mistake"). We have held in other contexts that the mere provision of goods or services to the government in excess of a party's legal obligation does "not create an implied-in-fact contract [for the government] to pay for them," and that such cases constitute "implied-in-law contract scenarios [that] are beyond the purview of the Tucker Act." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1327 (Fed. Cir. 1997) (finding claim barred by sovereign immunity where medical contractor sought payment for x-ray

---

*States*, 444 U.S. 460, 465 n.5 (1980); *Ala. v. United States*, 282 U.S. 502, 507 (1931); *Goodyear Tire & Rubber Co. v. United States*, 276 U.S. 287, 292–93 (1928); *United States v. Minn. Mut. Inv. Co.*, 271 U.S. 212, 217 (1926); *Merritt v. United States*, 267 U.S. 338, 341 (1925); *Hill v. United States,* 149 U.S. 593, 598 (1893).

services which the government accepted but was not contractually obligated to pay for).[9]

Thus, because Lumbermens' impairment of suretyship / *pro tanto* discharge claim is based on a non-contractual state law cause of action, or at most an implied-in-law contract theory, we hold that the Claims Court lacked jurisdiction to consider Lumbermens' claim.

Contrary to Lumbermens' assertions, this court's opinion in *National Surety* does not support its theory that the government has waived its sovereign immunity as to impairment of suretyship / *pro tanto* discharge

---

[9]     *See also Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) ("A recovery in quantum meruit is based on an implied-in-law contract. That is, a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice. The [Claims Court], however, lacks jurisdiction over contracts implied in law."); *Perri v. United States*, 340 F.3d 1337, 1343–44 (Fed. Cir. 2003) ("The Court of Federal Claims' jurisdiction over claims founded on an express or 'implied contract with the United States' 'extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.' Recovery in quantum meruit, however, is based upon a contract implied in law." (citations omitted)); *Fincke v. United States*, 675 F.2d 289, 296 (Ct. Cl. 1982) ("Plaintiff's difficulty with this claim is that a suit to recover compensation on a quantum meruit basis is an action on a contract implied in law . . . . It is well settled that this court does not have jurisdiction of claims based on an alleged contract implied in law."); *but see Union Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329–30 (Fed. Cir. 2006) (recognizing an exception whereby an implied-in-fact contract to pay the fair value of goods or services exists when they are rendered to the government pursuant to an express contract that turns out to be illegal and therefore void); *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986) (same).

claims.  As discussed above, *National Surety* was decided based on the theory of equitable subrogation.  118 F.3d at 1545–48.  The *National Surety* court expressly stated that it viewed the "doctrine of [equitable] subrogation" as "the appropriate theory of liability" in that case.  *Id.* at 1545. *National Surety* therefore has no bearing on the issue of whether the government has waived sovereign immunity with respect to claims based on the unapplied theory of impairment of suretyship / *pro tanto* discharge.[10]

In its amicus brief, the Surety & Fidelity Association of America contends that finding no waiver of sovereign immunity with respect to impairment of suretyship / *pro tanto* discharge claims would leave sureties without a remedy when the government impairs the surety's collateral.  This is incorrect.  If a surety concludes that the government has improperly impaired its collateral, the surety has the right to withhold payment on the bond, to the extent the surety has been prejudiced, based on the defense of impairment of suretyship / *pro tanto* discharge. We simply hold that, once a surety makes overpayments on its bond obligation, it has no right to affirmatively recover against the United States.

Thus, we find that the Claims Court lacked jurisdiction over Lumbermens' affirmative claim against the government on the theory of impairment of suretyship / *pro tanto* discharge.

---

[10]  We have consistently held that panel authority that does not address an issue is not binding as to the unaddressed issue."  *Ark. Game & Fish Comm'n*, 637 F.3d 1366, 1378 n.7 (Fed. Cir. 2011); *see also Sacco v. United States*, 452 F.3d 1305, 1308 (Fed. Cir. 2006); *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1282 (Fed. Cir. 2002); *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1581 (Fed. Cir. 1991).

II

We next turn to the Government's contention that the Claims Court lacked jurisdiction over Lumbermens' breach of contract claim based on the takeover agreement because Lumbermens failed to satisfy the jurisdictional prerequisites imposed by the CDA. "The determination of jurisdiction under the CDA is a question of law" and "is therefore subject to *de novo* review." *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 (Fed. Cir. 2009) (quoting *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004)).

Pursuant to § 602(a), the CDA

applies to any express or implied contract . . . entered into by an executive agency for—(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of personal property.

41 U.S.C. § 602(a). The Act requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." *Id.* § 605(a). For claims of more than $100,000, the contractor is further required to "certify that [its] claim is made in good faith." *Id.* § 605(c)(1). We have held that "submission of a certified claim to the contracting officer in the first instance is a jurisdictional prerequisite to filing a suit in the Claims Court." *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985); *see also* 41 U.S.C. § 609(a)(3) ("Any action [filed in the Claims Court] shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim . . . ."). Lumbermens did not submit a certified claim to

the contracting officer as required by the Act. However, the Claims Court found that the CDA did not apply to Lumbermens' claim because (a) the "takeover agreement [was] not a contract for the procurement of materials or services," and (b) "Lumbermens signed the takeover agreement as a surety fulfilling its performance bond obligation, not as a contractor completing a construction project." *Lumbermens II*, 90 Fed. Cl. at 560–61. We disagree on both points.

First, we find that the takeover agreement is clearly a contract for "the procurement of construction, alteration, repair or maintenance of real property." 41 U.S.C. § 602(a)(3). The agreement expressly states that "[t]his Takeover Agreement is for completion of defaulted Contract N44255-97-C-5515," which it describes as a contract "for Whole Site Repair/Revitalization [of the] Maylor Capehart Housing Area, Naval Air Station, Whidbey Island, Oak Harbor, WA." J.A. 314.

Lumbermens argues that the takeover agreement "does not itself procure construction services" but "instead arranges for and leads to a contract for the procurement of construction." Appellee's Br. 44. Lumbermens contends this case is analogous to *Coastal Corp. v. United States*, 713 F.2d 728 (Fed. Cir. 1983), in which we held that an implied contract requiring the government "to treat a bid [on a government contract] honestly and fairly" was not a procurement contract because it was "preliminary and ancillary to any contract . . . for goods or services." *Id.* at 730. That is not the situation here. Unlike the implied contract in *Coastal*, the takeover agreement in this case directly procured "the performance of all work and other obligations of the defaulted contract not presently completed or fulfilled." J.A. 314. The contract itself contained all material terms of the agreement, including provisions covering the payment terms, the required date

of completion for the construction work, and liquidated damages. J.A. 315. As such, the takeover agreement itself created a binding contract between the parties for the procurement of construction services.

We are similarly unpersuaded by Lumbermens' argument that the takeover agreement is "analogous . . . to a settlement agreement" and that "a claim alleging a breach by the government of a settlement agreement is not covered by the CDA." Appellee's Br. 45–46. We need not decide the issue of whether a settlement agreement can ever be covered by the CDA, because the takeover agreement here was not analogous to a settlement agreement. The agreement contains no language regarding a settlement of any dispute between the parties, and it contains no release of liability by either party—a feature common to settlement agreements. To the contrary, the takeover agreement expressly states that it "shall [not] be construed . . . as modifying, limiting or releasing [Lumbermens] from its obligations to the United States under its Performance and Payment Bonds" and that it "does not waive, prejudice, or in any way adversely affect or limit any claim that [Lumbermens] might have against the Government." J.A. 315–16. In short, no legal dispute was settled by the takeover agreement; rather, a binding contract was formed for the performance of all construction work left uncompleted under the defaulted contract.

Second, we find that the Claims Court erred in concluding that Lumbermens did not enter the takeover agreement as a "contractor" within the meaning of the CDA. The Act defines "contractor" as "a party to a Government contract other than the Government." 41 U.S.C. § 601(4). Lumbermens argues that the takeover agreement in this case is somehow outside the scope of the CDA because it is a three-party agreement between Atherton (referred to as the "Completing Contractor"),

Lumbermens (referred to as the "Surety"), and the United States, rather than a two-party agreement between a surety and the government. *See* J.A. 314. Lumbermens contends this takeover agreement "merely memorialized and reaffirmed [its] pre-existing obligations as [a] performance bond surety" and that "Atherton—and not Lumbermens—is clearly and expressly considered the 'contractor'" under the agreement. Appellee's Br. 47–48. Lumbermens cites the following language of the takeover agreement for support:

> It is understood and agreed that the Surety, by entering into this Agreement, *is not acting as a contractor* but is instead acting in its capacity *as a performance bond surety*. The Surety, who will have no employees on the project site, shall have no obligation to furnish any insurance under the contract, and any insurance required under the contract *shall be provided by the Completing Contractor*.

J.A. 316 (emphasis added). Lumbermens contends that the agreement's express designation of it as a "surety" rather than a "contractor" exempts it from the jurisdictional requirements of the CDA. Appellee's Br. 50. We disagree.[11]

---

[11] Lumbermens cites this court's opinion in *Admiralty Construction* for the proposition that "Congress simply had an entirely different set of problems in mind when it passed the CDA, and we see no reason to judicially transform sureties into 'contractors' where [C]ongress has not done so." 156 F.3d at 1221 (quoting *United States v. Seaboard Sur. Co.*, 817 F.2d 956, 962 (2d Cir. 1987)). However, both *Admiralty* and *Seaboard* involved situations where the surety "did not execute a takeover agreement with the [government] to complete the defaulted contract" and therefore "[could not] show

Despite the takeover agreement's reference to Lumbermens as "the Surety," the agreement makes clear that Lumbermens became bound to complete the defaulted construction contract by assuming the role of a prime contractor and hiring Atherton as its subcontractor. The takeover agreement expressly incorporated "[t]he provisions and clauses of the defaulted contract," J.A. 314, and it further provided that:

> [T]he Government *has made demand upon the Surety for completion of the work* in accordance with the Surety's obligations under its Performance Bond.
>
> [T]he Surety has advised the Government that *it will undertake the completion of the work* and *will contract with the Completing Contractor for completing the work* remaining under the contract in accordance with its terms and conditions of the terminated contract . . . .
>
> . . . .
>
> The Government and Surety agree that $7,392,381.24 is the unpaid contract balance, including retainages. The Completing Contractor will be paid by the Government in accordance with and in the manner provided by the defaulted contract and this Agreement. *In addition, the Completing Contractor shall be paid by the Surety in accordance with its Completion Agreement with the Surety.*

---

that it 'entered into' a contract with 'an executive agency'" as required by the CDA. *Admiralty*, 156 F.3d at 1221; *see also Seaboard*, 817 F.2d at 961 (noting that the suretyship agreement at issue was "not a contract to which the government [was] a party").

J.A. 314–15 (emphases added). As required by the take-over agreement, Lumbermens thereafter entered into a completion contract with Atherton, which stated that "[t]he Parties expressly acknowledge and understand that *Completing Contractor [Atherton] is a subcontractor to Surety [Lumbermens]*." J.A. 324 (emphasis added). The completion contract further specified that Atherton had "no authority to negotiate . . . any Change Order with respect to any issues" arising with the government, and it required that any claims Atherton had against the government "be submitted . . . to [Lumbermens] for processing . . . . in [Lumbermen's] name." J.A. 324–25.

We have previously recognized that where, as here, a surety enters a takeover agreement with the government under which the surety agrees to complete the performance of a defaulted contract, the surety assumes the role of a prime contractor and becomes "a party to a Government contract" in direct privity with the United States. 41 U.S.C. § 601(4).

For example, in *Fireman's Fund*, a surety and the government entered into a takeover agreement following the contractor's default. 313 F.3d at 1346. In the inverse of the present situation, the surety followed CDA procedures and filed claims with the contracting officer (rather than the Claims Court) seeking remission of assessed liquidated damages based on delays allegedly caused by the government both before and after the takeover agreement was executed. *Id.* at 1347. On appeal to the Board of Contract Appeals ("Board"), the Board dismissed the surety's claims that arose *before* the takeover agreement on the ground that the surety was not a "contractor" under the CDA at the time those claims arose. *Id.* We affirmed, finding that the surety was not "a 'contractor' with the United States . . . with respect to its pre-takeover claims," *id.* at 1352, because "[i]t was not a party to any

contract with the government *prior to the takeover agreement* it had with the government, and its pre-takeover claims did not arise under such a contract," *id.* at 1351 (emphasis added). We subsequently affirmed our *Fireman's Fund* decision on nearly identical facts in *United Pacific Insurance Co. v. Roche*, 380 F.3d 1352 (Fed. Cir. 2004), holding that "the Board had no jurisdiction over [the surety's] claims that were based upon events that occurred *prior to the takeover agreement.*" *Id.* at 1356 (emphasis added). These cases reflect a clear understanding that a surety does become a "contractor" within the meaning of the CDA when it enters into a takeover agreement, and the CDA applies to any post-takeover claims arising out of that agreement. The Claims Court has reached this same conclusion in earlier cases.[12]

We finally reject Lumbermens' contention that the applicability of the CDA to its takeover agreement claim would violate the so-called "single point of contact" principle due to the fact that Atherton is also a party to the takeover agreement in privity of contract with the United States. In discussing the reasons for limiting the CDA to

---

[12]  *See, e.g.*, *Westech Corp. v. United States*, 20 Cl. Ct. 745, 749 (1990) (noting that, while a surety "may not bring a claim directly under the CDA," it can do so if it "execute[s] a takeover contract with [the government] to complete the contract"); *Travelers Indem. Co. v. United States*, 16 Cl. Ct. 142, 153 (1988) ("[W]here a surety has executed a takeover agreement, as here, upon the default of the prime contractor in order to complete the work under the construction contract, it becomes a 'party to a Government contract' and thus, logically, a 'contractor' within the meaning of § 601(4) of the CDA."); *Universal Sur. Co. v. United States*, 10 Cl. Ct. 794, 800 (1986) ("[Where a] separate takeover agreement[ ] [is entered] between the government and the surety after default by the contractor. . . . the surety in effect becomes the contractor, subject to the terms of the new agreement.").

claims by "contractors," the legislative history of the CDA states:

> The recommendations of the Procurement Commission specifically *exclude bringing subcontractors under the provisions of [the Act]*. . . . By administering its procurement through a *single point of contact*, the Government's job is made both simpler and cheaper. The *single point of contact* approach also helps suppress frivolous claims. . . . By forcing the prime contractor to administer its subcontractor network, the Government permits prime contractors and subcontractors at all tiers to use to some extent their familiar commercial procedures in contract award and administration. . . . Finally, by *denying the subcontractors direct access* to administrative remedies, the Government is forcing the prime contractor and the subcontractor to negotiate their disputes.

S. Rep. No. 95-1118, at 16–17, *reprinted in* 1978 U.S.C.C.A.N. at 5250 (emphases added). This legislative history suggests that claims by third parties who are not in privity of contract with the government are not covered by the CDA. *See Winter*, 570 F.3d at 1371 (stating that a subcontractor not in contractual privity with the United States was not a "contractor" within the meaning of the CDA); *Admiralty Constr. Inc.*, 156 F.3d at 1220–21 (stating that a surety not in privity with the United States was not a "contractor"). In the present case, however, both Lumbermens and Atherton are parties to the take-over agreement in direct privity of contract with the United States. We see nothing in the CDA, its legislative history, or our prior cases that would prohibit multiple obligors on a contract with the government from being considered "contractors" within the meaning of the Act.

Accordingly, because Lumbermens failed to submit a certified claim to the contracting officer as required by § 605(a) and (c)(1), the Claims Court lacked jurisdiction over the claim.

CONCLUSION

Because we find that the Claims Court lacked jurisdiction over Lumbermens' claims, we reverse the court's decision and remand with instructions to dismiss the complaint. Due to the Claims Court's lack of jurisdiction, we hold that Lumbermens' cross-appeal seeking additional damages is moot.

**REVERSED and REMANDED**