# United States Court of Appeals for the Federal Circuit

---

**GUARANTEE COMPANY OF NORTH AMERICA, USA,**
*Appellant*

**v.**

**IKHANA, LLC,**
*Appellee*

---

2018-1394

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 60462, 60463, 60464, 60465, 60466, 61102, Administrative Judge James R. Sweet.

---

## ON PETITION FOR REHEARING EN BANC

---

PATRICK M. PIKE, Pike & Gilliss LLC, Towson, MD, filed a petition for rehearing en banc for appellant. Also represented by ROBERT KLINE.

WILLIAM ATKINS SCOTT, Pederson & Scott, P.C., Charleston, SC, filed a response to the petition for appellee.

CORINNE ANNE NIOSI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for amicus curiae United States. Also

represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY.

EDWARD GRAHAM GALLAGHER, The Surety & Fidelity Association of America, Washington, DC, for amicus curiae The Surety & Fidelity Association of America.

———————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges*.

WALLACH, *Circuit Judge*, with whom NEWMAN, DYK, and MOORE, *Circuit Judges*, join, dissents from the denial of the petition for rehearing en banc.

PER CURIAM.

# O R D E R

A petition for rehearing en banc was filed by appellant Guarantee Company of North America, USA and a response was invited by the court and filed by appellee Ikhana, LLC. A motion for leave to file an amicus curiae brief was filed by The Surety & Fidelity Association of America ("SFAA") and granted by the court. The court further invited the United States to file an amicus curiae brief. The petition for rehearing and SFAA amicus curiae brief were first referred to the panel that heard the appeal, and thereafter, the petition for rehearing, response, and amici curiae briefs of SFAA and the United States were referred to the circuit judges who are in regular active service. A poll was requested, taken, and failed.

Upon consideration thereof,

IT IS ORDERED THAT:

1) The petition for panel rehearing is denied.

2) The petition for rehearing en banc is denied.

3)  The mandate of the court will issue on June 5,
    2020.

FOR THE COURT

May 29, 2020                    /s/ Peter R. Marksteiner
   Date                        Peter R. Marksteiner
                               Clerk of Court

# United States Court of Appeals for the Federal Circuit

_____

**GUARANTEE COMPANY OF NORTH AMERICA, USA,**
*Appellant*

**v.**

**IKHANA, LLC,**
*Appellee*

_____

2018-1394

_____

Appeal from the Armed Services Board of Contract Appeals in Nos. 60462, 60463, 60464, 60465, 60466, 61102, Administrative Judge James R. Sweet.

_____

WALLACH, *Circuit Judge*, with whom NEWMAN, DYK, and MOORE, *Circuit Judges*, join, dissenting from denial of a petition for rehearing *en banc*.

I respectfully dissent from the court's decision declining to rehear this appeal en banc. I believe that under the doctrine of equitable subrogation a surety should be able to step into the shoes of a government contractor in the event of that contractor's default under fundamental principles of contract law. As our precedent now erroneously stands, a surety is hindered from playing its necessary role in government contracting—bringing efficient resolution to contract disagreements, assuming financial risk, and ensuring execution of performance—because it lacks the legal rights

it needs to ensure speedy dispute resolution. *See Admiralty Constr. by Nat'l Am. Ins. Co. v. Dalton*, 156 F.3d 1217 (Fed. Cir. 1998), *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344 (Fed. Cir. 2002). Moreover, I think that the interpretations of the Contract Disputes Act ("CDA"), which governs government contracting, in *Admiralty* and *Fireman's Fund* are based on an erroneous extrapolation of the CDA's legislative history and are at odds with basic tenets of insurance contract law. I also have grave concerns about the implications of the impediment *Admiralty* and *Fireman's Fund* pose. Specifically, sureties for government contracts must recognize the downstream shoals of our case law, and either opt out of providing the service or, recognizing the potential for heightened financial risk, charge a higher rate for their service—a cost that is passed onto the U.S. taxpayer and a court created structural inefficiency in the system. Accordingly, I respectfully dissent.

## I. Government Contracting Law

The CDA regulates how the federal government may contract with non-governmental entities. *See* 41 U.S.C. §§ 7101–7109. The CDA provides the statutory framework for contract dispute resolution. *See id.* §§ 7104–7107. Under the CDA, "[a] contractor . . . may appeal the decision [by a government contracting officer] to an agency board[,]" *id.* § 7104(a)—here, the Armed Services Board of Contract Appeals ("ASBCA"), *see id.* § 7105(a). Limiting such appeals to the contractor is based on the policy rationale of winnowing down all claims to a "single point of contact"; this prevents a deluge of duplicative claims—with their associated costs—against the government for any given contract. *See* S. REP. No. 95-1118, at 16 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5250 ("the Senate Report"). Where a surety takes over the contract, we have held that the surety assumes the liabilities of the original contractor and so is a "contractor" with the government, albeit solely with respect to the contract's outstanding performance. *See Fireman's Fund*, 313 F.3d at 1351 (determining that,

as the surety "was not a party to any contract with the government prior to the takeover agreement," the surety was not a "contractor" under the CDA and so could not bring claims against the government).

A suretyship is a contractual relationship "where one person," the obligator, "has undertaken an obligation [to an obligee] and another person[,]" the surety, "is also under an obligation or other duty to the obligee" to perform that obligator's duty "rather than the [obligator]." Restatement (First) of Security § 82 (Am. Law Inst. 1941). Where an obligator, such as a contractor, enters a contractual relationship, the surety agrees to assume the contractor's obligations—such as the performance and debts—of the contractor in the event of default. *See* Restatement (Third) of Suretyship & Guaranty § 1 (Am. Law Inst. 1996); *see also* Couch on Ins. §§ 1:14–15. Under the doctrine of equitable subrogation, a surety, as a subrogee, can assert the claims of a defaulted obligator. *See* Restatement (Second) of Contracts § 317 (1981); *id.* § 340, cmt. a. We have held that "Congress had not intended for the Anti-Assignment Act to cover subrogation claims," and therefore that "the Tucker Act's waiver of sovereign immunity extends to a subrogee." *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1373–74 (Fed. Cir. 2001); *see* 28 U.S.C. § 1491(a) (Tucker Act); 31 U.S.C. § 3727 (Anti-Assignment Act).

A surety benefits both the contractor and the party seeking performance, here the government, because the surety's agreement with the contractor ensures that, in the event of default, the contracted performance is executed without significant delay (a "performance" bond) and subcontractors' valid costs are paid in a timely manner (a "payment" bond), while the cause of the default can be litigated. *See* 40 U.S.C. § 3131(b) (requiring government contractors to possess both performance and payment bonds); *see also* Couch on Ins. §§ 1:15, 163:10. If a surety fails to execute its obligations under either bond, the government may sue

the surety. *See Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985) (concluding that "a surety, as [a] bondholder is as much a party to the [g]overnment contract as the contractor" and so may be sued by the government).

If a contractor defaults on its performance, the surety may discharge the performance bond in several ways. The surety "is not obligated to perform the contract of the contractor though it may do so[,]" such that it "may discharge its obligations by taking over the contract and completing performance, assuming liability for the government's costs in completing the contract that exceed the contract price, or . . . provid[e] funds to an insolvent contractor to complete the performance." Couch on Ins. § 164:14. The payment bond is discharged through negotiation or possibly litigation with subcontractors. *See id.* § 164:16.

Under the doctrine of equitable subrogation, the general rule is that a surety can assert the claims of a defaulted contractor. *See* Restatement (Second) of Contracts § 317 (1981); *id.* § 340, cmt. a; *Prairie State Nat. Bank v. United States*, 164 U.S. 227, 231 (1896). In that connection, we have held that "Congress had not intended for the Anti-Assignment Act to cover subrogation claims," and therefore that "the Tucker Act's waiver of sovereign immunity extends to a subrogee." *Ins. Co. of the W.*, 243 F.3d at 1373–74; *see also United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366 (1949).

The anomaly presented by this case is that the doctrine of equitable subrogation is not recognized for claims under the CDA. Before the surety steps into the shoes of the contractor—or in situations where the surety never executes a takeover agreement with the government and instead ensures the contract is carried out by other means—we have concluded that the surety is *not* a "contractor" with the government and is *not* permitted to bring claims under the CDA. *See Admiralty*, 156 F.3d at 1220–21, *Fireman's*

*Fund*, 313 F.3d at 1351–52. As a result, a surety can assert a claim at the Court of Federal Claims, but not at a Board of Contract Appeals. This is contrary to the purpose of the CDA: channeling contract disputes through a single, efficient process. *See generally* S.Rep. No. 95–1118, reprinted in 1978 U.S.C.C.A.N. at 5250.

*Admiralty* and *Fireman's Fund* were wrongly decided; they unnecessarily create inconsistency between cases in the Court of Federal Claims and the Boards of Contract Appeals and create a conflict between government contracting law and fundamental principles of suretyship and contract law.

## II. *Admiralty* and *Fireman's Fund*

In *Balboa*, we first addressed the relationship between the government, a contractor, and a surety in the event of default, but we stopped short of determining whether a surety was a contractor or otherwise in privity with the government upon the default of the contractor. *See Balboa*, 775 F.2d at 1160–61 ("Although it is conceivable that under certain circumstances a surety could assert rights against the [g]overnment under the third-party beneficiary rule . . . or even as one in privity in contract with the [g]overnment . . . the traditional means of asserting a surety's claim is under the equitable doctrine of subrogation." (internal citations omitted)); *see also Ins. Co. of the W.*, 243 F.3d at 1370 ("[I]n *Balboa* we reserved the question whether there was a contract or privity of contract between the government and a surety.").

We considered the unanswered question in *Admiralty* and decided a surety is not a "contractor" within the meaning of the CDA. *See Admiralty*, 156 F.3d at 1220–21. In doing so, we said that "the central issue in [that] case [wa]s whether the CDA permits [the surety] to bring [a] claim on behalf of [the contractor]" and concluded that both because a surety is not a "contractor" as defined by the CDA and because "[t]he CDA limits the eligibility to appeal to the

boards of contract appeals *to contractors* with claims on contracts entered by a [g]overnment agency," which the surety had not done, the surety lacked the standing to bring such an appeal. *Id.* at 1220–21 (emphasis added). We then addressed "whether [the surety] can represent [the contractor] in an appeal to the [ASBCA]" and determined that, in the "limited circumstances" where the surety "take[s] over contract performance or finance[s] the completion of the defaulted contract under its performance bond," the surety may be "entitl[ed] . . . to succeed to the contractual rights of the contractor against the government." *Id.* at 1222 (internal quotation marks and citations omitted). In *Fireman's Fund*, we clarified this determination, concluding that the surety could only raise claims against the government that arose from the work the surety itself did following the takeover of the contract and not any claims pertaining to the prior period. *See* 313 F.3d at 1351; *see also id.* ("[The surety] was not a party to any contract with the government prior to the takeover agreement it had with the government, and its pre-takeover claims did not arise under such a contract.").

Our analysis in *Admiralty*, and by extension *Fireman's Fund*, gave little consideration to the argument that, because the surety and the contractor had agreed that the contractor would cede all legal rights to the surety in the event of default, the surety should assume all of the contractor's legal rights—including those to appear before a board such as the ASBCA—with respect to the contract. *See generally Admiralty*, 156 F.3d at 1220–22. Instead, we focused primarily on the Senate Report that addresses the policy rationales supporting the creation of the CDA. *See id.* at 1221. Undergirding the rationale "for limiting the appeal right to a single 'contractor' [in] the Senate Report," we noted, was the goal to narrow the claims to those between the government and "a 'single point of contact'—the prime contractor." *Id.* at 1220 (quoting S. REP. No. 95-1118, at 16). Limiting appeals to only a single contractor

"would prevent multiple, duplicative claims and appeals by subcontractors." *Id.* (citing S. REP. No. 95-1118, at 16). The CDA, therefore, "makes only a single 'contractor' eligible to appeal a contracting officer's final decision." *Id.* We explained that the Senate Report itself suggested the best system was one of a "single point of contact," or ensuring that only the contractor could pursue claims against the Government before the ASBCA and all other claims would be litigated elsewhere, such as between the contractor and subcontractors in district court. *Id.*; *see* S. REP. No. 95-1118, at 16.

Closer analysis of the Senate Report, however, demonstrates the portion relied upon by our precedent relates *entirely* to precluding *subcontractors* from the administrative remedies of the CDA, *see* S. REP. No. 95-1118, at 16–17, and speaks nothing of sureties, *see generally id.* *See, e.g.*, S. REP. No. 95-1118, at 16 (explaining that "[t]he recommendations . . . specifically exclude bringing *subcontractors* under the provisions of" the CDA (emphasis added)), *id.* ("If direct access were allowed to *all Government subcontractors*, contracting officers might, without appropriate safeguards, be presented with numerous frivolous claims that the prime contractor would not have sponsored." (emphasis added)), *id.* (explaining that "[b]y forcing the prime contractor to administer its subcontractor network, the Government permits prime contractors and subcontractors" to resolve contract disputes through "their familiar commercial procedures"), *id.* at 17 (concluding that "denying the subcontractors direct access" to the CDA would "forc[e] the prime contractor and the subcontractor to negotiate their disputes"); *see also Admiralty*, 156 F.3d at 1220 (citing S. REP. No. 95-1118, at 16), *Fireman's Fund*, 313 F.3d at 1351–52 (same). Congress did not mention sureties when discussing the limits of the CDA's administrative remedies jurisdiction. *See generally* S. Rep. No. 95-1118, at 16–17. In *Admiralty* and *Fireman's Fund*, we equated a surety to a subcontractor with *no* supporting analysis.

A surety is different from a subcontractor in fundamental respects. Significantly, the surety is obligated to engage and negotiate with the party seeking performance to ensure that it is completed. *See Dependable Ins. Co. v. United States*, 846 F.2d 65, 66–67 (Fed. Cir. 1988) (determining that a performance bond guarantees that the surety will ensure that the contracted performance will be completed upon the default of the contractor). These differences are showcased in the appeal at hand, regarding the performance and payment bonds of Surety Guarantee Company of North America ("GCNA") and Ikhana, LLC ("Ikhana"). Here, as in *Fireman's Fund*, the terms of the bonds included an indemnity agreement in which the contractor assigned to its surety all rights under the contract and all legal actions and claims that the contractor may have had. J.A. 2 (quoting GCNA and Ikhana's indemnity agreement as granting to GCNA, in the event of Ikhana's default, the right to "assert and prosecute any right or claim hereby assigned, transferred or otherwise conveyed in the name of [Ikhana] and to compromise and settle any such right or claim on such terms as it considers reasonable . . . in its sole and absolute discretion"); *see Fireman's Fund*, 313 F.3d at 1346 (explaining that the surety's bond included the "General Indemnity Agreement" in which the contractor assigned "all of their rights under the contract . . . including . . . all actions, causes of actions, and claims and demands whatsoever which the [contractor] may have in . . . [the] contract covered by such [b]ond"). To engage in a business relationship with a contractor, a bonding insurer must be able to set its prices upon the assumption that the clauses of its contract are valid.

Our court has repeatedly turned to these two cases and specifically to the two pages of the Senate Report to support the proposition that a surety does not become a "contractor" with the government upon a contractor's default. *See Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1321 (Fed. Cir. 2011) (relying on *Admiralty* and the Senate

Report at pages 16 and 17 to support the assertion that "[t]his legislative history suggests that claims by third parties who are not in privity of contract with the government are not covered by the CDA"); *Hardie v. United States*, 19 F. App'x 899, 905 (Fed. Cir. 2001) (explaining that, in *Admiralty*, the court, in reliance on the Senate Report, determined that "[d]ue to the strong policy interest in maintaining a 'single point of contact' with the United States, there is a correspondingly strong resistance to extend the concept of 'privity' beyond the actual parties with which the United States originally contracted explicitly" (citation omitted)); *Ins. Co. of the W.,* 243 F.3d at 1370–71 (relying on *Admiralty* to conclude that "there is no such [contractual] relationship" between the government and a surety).  That proposition is erroneous as a matter of law.

## III. This Case Squarely Presented the Opportunity to Review Our Precedent

The roles and responsibilities of sureties—including the assumption of all legal rights—are well-defined within insurance contract law and are applicable to both private and public contracts.  *See Alvin, Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1564 (Fed. Cir. 1987) ("The government enters into contracts as does a private person, and its contracts are governed by the common law." (citation omitted)).  They necessarily apply here.  Because of *Admiralty* and *Fireman's Fund*, however, a surety of a government contract has its hands tied when it comes to resolving ongoing litigation against the government and executing performance.  Indeed, this is the issue presented in the instant case.  Ikhana the contractor, filed claims against the government with the ASBCA upon its default termination.  J.A. 2–3.  The government sued GCNA on its performance bond and GCNA stepped in to ensure the contract was executed despite the default.  J.A. 2–3.  To do so, GCNA entered into a settlement agreement with the government to resolve the government's claim on the performance bond.  J.A. 3–4.  GCNA tendered a new contractor to complete the

work.  J.A. 4.  At the same time, GCNA agreed to dismiss Ikhana's appeal against the government and the government agreed to release GCNA from all liability relating to the performance and payment bonds.  J.A. 4.  This plan was stymied when GCNA was denied standing before the ASBCA, which held, based on erroneous authority, that it did not become a "contractor" with the government.  J.A. 6.

The facts of this case are representative of the nature of a surety's role—bringing efficient resolution to contract disagreements, assuming financial risk, and ensuring performance—and of the necessity for granting sureties the legal rights they need to ensure speedy resolutions.  The significance of this standard contractually based negotiating tool should not be understated.  Lengthy delays in public projects are problematic, expensive, and potentially dangerous.  Unfortunately, as our precedent now stands, sureties for government contracts must recognize the lurking ensnarement, and either cancel the service or actuarially charge a higher rate for their services.  Whatever the outcome, the overall cost of doing business will be higher for all government contractors.